UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Adhesive Technologies, Inc.</u>,
     Plaintiff

     v.                         Case No. 10-cv-75-SM
                                  Opinion No. 2011 DNH 085
<u>Isaberg Rapid AB</u>,
     Defendant

**<u>O R D E R</u>**

Plaintiff, Adhesive Technologies, Inc. ("Ad-Tech"), located in Hampton, New Hampshire, agreed to provide the engineering design for, and to manufacture, customized glue guns for Defendant Isaberg Rapid AB ("Rapid"), a Swedish corporation. The glue guns were designed and manufactured by Ad-Tech, but, Ad-Tech says, Rapid did not live up to its end of the bargain. Rapid was expected by Ad-Tech to purchase enough manufactured guns to provide Ad-Tech with a reasonable return on its investment, or, all its glue gun requirements. But, Ad-Tech says, Rapid refused to do so. Ad-Tech also claims that Rapid obtained confidential technical information from Ad-Tech by false pretenses and then used that information to have virtually identical glue guns manufactured in China.

In this suit Ad-Tech alleges that Rapid breached its contract, breached the implied covenant of good faith and fair

dealing, misappropriated its trade secrets, and committed fraud. Rapid moves to dismiss this case for lack of personal jurisdiction and, because it prefers to defend against Ad-Tech's claims in Sweden, also moves to dismiss on <u>forum</u> <u>non</u> <u>conveniens</u> grounds.  Rapid also asserts failure to state a viable claim (Fed. R. Civ. P. 12(b)(6)), and insufficient fraud allegations (Fed. R. Civ. P. 9(b)), as grounds that are "independently sufficient alternative[s]" to its primary grounds for dismissal. Doc. No. 23-1, pg. 3.

## Background

Although the parties disagree with respect to the inferences properly drawn from many of the jurisdictionally relevant facts, the circumstances relevant to the pending issues are largely undisputed.[1]

Rapid is a corporation organized under the laws of the Kingdom of Sweden.  Its principal place of business is in Hestra, Sweden.  Rapid manufactures and markets, among other things, hot

---

[1]  To the extent the motion seeks dismissal for failure to state a claim, it must be decided on the pleadings.  The court may, however, consider facts outside the pleadings relevant to the personal jurisdiction and <u>forum</u> <u>non</u> <u>conveniens</u> issues.  In the few instances where relevant jurisdictional facts are disputed, the court accepts Ad-Tech's proffers as true.  <u>See infra</u> Discussion, Part I; <u>see also</u> <u>Adelson v. Hananel</u>, 510 F.3d 43, 50 (1st Cir. 2007).

melt glue guns for hobby and professional uses.  Rapid has no

shareholders or employees in New Hampshire; it is not registered

to do business in this state; and it does not own or lease any

property here.


     Ad-Tech is a New Hampshire corporation.  Its principal place

of business is in Hampton, New Hampshire.  The company designs

and develops adhesives and applicators for adhesives, including

hot melt glue guns and hot melt adhesive compositions for use in

such guns.  The company was co-founded in 1981 by its president

and CEO, Peter Melendy, and its product design engineer, Richard

Belanger.  For more than ten years, Ad-Tech and Rapid[2] had a

commercial relationship pursuant to which Ad-Tech sold glue and

glue applicator products to Rapid for exclusive resale outside

North America.  From 2001 to 2005, Rapid also sold related

products to Ad-Tech and shipped those products directly into New

Hampshire.  During that time, Rapid employed a sales

representative in New Hampshire to foster its relationship with

Ad-Tech.  In September, 2003, the regional manager of Rapid's

North American Tools Division, Danny Weil, contacted Melendy and

---

[2]  Ad-Tech's pre-2001 business relationship was with the French
company Rocafix.  In 2001, Rapid acquired Rocafix.  For the sake
of simplicity, the court will refer only to "Rapid."

arranged to meet with him at Ad-Tech's offices in Hampton.
Weil's contacts with Ad-Tech eventually ended in 2004.

Through several e-mails sent in 2001 to 2002, Rapid
approached Melendy regarding a possible redesign of some of
Rapid's glue guns.  A few years later, on March 15, 2004, the
parties executed, in Cologne, Germany, a two page written
agreement ("Agreement") under the terms of which Ad-Tech would
perform engineering services in connection with the design of
internal components and mechanisms for new hot melt glue guns,
and would arrange for their manufacture.  Rapid would provide the
external design for the guns (intended to have a "Euro-look") and
would purchase "some" of the finished products from Ad-Tech.  Am.
Cmpt. Ex. A, ¶1, Doc. No. 20-1, pg. 1.

The Agreement also provided that the parties "shall have an
open and consultative technical co-operation regarding this
project," and that they "shall not . . . disclose or use for any
purposes other than those permitted under this Agreement, any
information of a confidential nature concerning the other party's
technology, business or affairs obtained in the course of their
activities under this Agreement."  Am. Cmpt. Ex. A, ¶¶8-9, Doc.
No. 20-1, pg. 2.

4

Some six months later, in November, 2004, Rapid executives Mikael Schentz and Toby Holm traveled to Ad-Tech's offices in Hampton to "further define the parties' terms of performance and to move toward a final agreement regarding the exact internal design and development services" to be provided by Ad-Tech.  Am. Cmpt. ¶12, Doc. No. 20-1, pg. 5.  Throughout the spring of 2005, a series of meetings in Europe, conference calls, and e-mail exchanges between Ad-Tech and Rapid occurred — generally related to engineering questions or developments relevant to the contractual undertaking.  From 2004 until 2006, Ad-Tech performed engineering services under the contract at its Hampton offices. By early June, 2005, the new technical designs were completed and the engineering was ready for Rapid's final approval.

Rapid did not immediately approve the final designs, however, and for several months the parties worked to finalize the project.  On September 15, 2005, Rapid's "engineer responsible for this program" requested "via telephone" that Ad-Tech send to Rapid the complete design drawings for all parts of the redesigned glue guns, as contained in CAD (computer aided design) files.  Am. Cmpt. Ex. A, ¶20, Doc. No. 20-1, pgs. 20-21. Rapid claimed that its request was "exclusively for [Rapid's]

SAP/ISO[3] documentation and for help with the final handleset
refinements."  Id.  Ad-Tech sent the requested computer files,
but reminded Rapid "of the highly sensitive and confidential
nature of Ad-Tech's proprietary technology in the internal
designs" contained in the files.  Am. Cmpt. Ex. A, ¶21, Doc. No.
20-1, pg. 7.

Ad-Tech thereafter arranged for the manufacture of the new
glue guns and delivered to Rapid "at least one shipment."  Am.
Cmpt. ¶ 18, Doc. No. 20, pg. 6.  The complaint asserts that at
some point Rapid disclosed Ad-Tech's confidential technical
information to manufacturers in China and Taiwan.  Am. Cmpt. ¶43,
Doc. No. 20, pg. 11.  "These manufacturers then produced and
supplied the new glue guns directly to . . . Rapid."  Id.  Rapid
ceased buying glue guns from Ad-Tech.  Ad-Tech alleges that
Rapid's stated reason for obtaining the confidential information
— European Union regulatory compliance — was false and
constituted a fraudulent material misrepresentation of fact.  The
real reason Rapid sought the technical information was not
related to regulatory compliance, but "was to enable . . . Rapid
to eliminate Ad-Tech from the supply and distribution chain for
the new line of hot melt glue guns."  Id.

---

[3]  SAP and ISO refer to European Union quality management
standards.

Rapid moves to dismiss this case for lack of personal jurisdiction, on forum non conveniens grounds, for failure to state cognizable legal claims, and failure to plead fraud with particularity.

## Personal Jurisdiction

*A.   Statutory and Constitutional Prerequisites*

In a diversity case, personal jurisdiction over a nonresident defendant is governed, in part, by the forum state's long-arm statute.  See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 690 (1st Cir. 1993). When personal jurisdiction is contested, the plaintiff bears the burden of establishing personal jurisdiction.  See Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995); Kowalski v. Doherty, Wallace, Pillsbury & Murphy, Attorneys at Law, 787 F.2d 7, 8 (1st Cir. 1986).

Assertions of jurisdictional fact are construed in the plaintiff's favor, see Buckley v. Bourdon, 682 F. Supp. 95, 98 (D.N.H. 1988), and, if the court proceeds based upon the written submissions of the parties without an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction exists.  See Kowalski, 787 F.2d at 8; Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 674-75 (1st Cir. 1992).  Nevertheless, the

7

plaintiff's demonstration of personal jurisdiction must be based on specific facts set forth in the record in order to defeat a defendant's motion to dismiss.  See Ticketmaster-New York v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994).  And, "[i]n reviewing the record before it, a court 'may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment.'" VDI Technologies v. Price, 781 F. Supp. 85, 87 (D.N.H. 1991) (quoting Lex Computer & Management Corp. v. Eslinger & Pelton, P.C., 676 F. Supp. 399, 402 (D.N.H. 1987)).

To establish personal jurisdiction over a non-resident defendant, the plaintiff must show, first, that the forum state's long-arm statute confers jurisdiction over the defendant. Second, plaintiff must show that the exercise of personal jurisdiction comports with constitutional due process standards (by showing that the defendant has sufficient "minimum contacts" with the forum state and that the exercise of jurisdiction would be consistent with traditional notions of fair play).  See Kowalski, 787 F.2d at 9-10.  New Hampshire's corporate long-arm statute, RSA 293-A:15.10, permits the exercise of personal jurisdiction over foreign corporations and unregistered professional associations to the full extent permitted by federal law.  See Sawtelle, 70 F.3d at 1388.  Put another way, the reach

of New Hampshire's corporate long-arm statute is coextensive with the outer limits of due process protection afforded under the federal constitution.  Accordingly, the determinative issue is whether the exercise of personal jurisdiction over Rapid comports with federal constitutional due process guarantees.

Ad-Tech, then, must demonstrate that Rapid has "certain minimum contacts with [New Hampshire] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  <u>Helicopteros Nacionales de Colombia, S. A. v. Hall</u>, 466 U.S. 408, 414 (1984) (citation and internal punctuation omitted).  Before finding that a defendant has such "minimum contacts," the court must be satisfied that the defendant's conduct bears such a "substantial connection with the forum State" that the defendant "should reasonably anticipate being haled into court there."  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 473-75 (1985) (citing <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980)).

B.  *General v. Specific Jurisdiction*

A court may exercise either general or specific jurisdiction over a defendant.  "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in

9

continuous and systematic activity, unrelated to the suit, in the forum state." United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992). Ad-Tech does not contend that Rapid engaged in "continuous and systematic activity" in New Hampshire, nor does it ask the court to exercise general jurisdiction over Rapid. Accordingly, if the court may properly exercise personal jurisdiction over Rapid, it is specific jurisdiction.

A court may exercise specific jurisdiction when the cause of action arises directly out of, or relates to, the defendant's forum-based contacts. United Elec. Workers, 960 F.2d at 1088-89. In an effort to assist trial courts in determining whether they may properly exercise specific personal jurisdiction over a defendant, the Court of Appeals has formulated a three part test.

First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must be reasonable, in light

10

of what are known as the "gestalt factors." <u>United Elec.
Workers</u>, 960 F.2d at 1089.  An affirmative finding as to each of
those three elements — relatedness, purposeful availment, and
reasonableness — is necessary to support exercise of personal
jurisdiction.  <u>See</u> <u>Phillips Exeter Academy v. Howard Phillips
Fund, Inc.</u>, 196 F.3d 284, 288 (1st Cir. 1999).

*C. Relatedness*

     To sustain its <u>prima</u> <u>facie</u> burden as to the first element of
the three part specific jurisdiction test, Ad-Tech must
demonstrate that its claims directly relate to, or arise from,
Rapid's contacts with this forum.  <u>Harlow v. Children's Hosp.</u>,
432 F.3d 50, 61 (1st Cir. 2005).  Although the relatedness
standard is a "flexible, relaxed standard," <u>Adelson</u>, 510 F.3d at
49 (quotation and citation omitted), it is not satisfied where
"'the connection between the cause of action and the defendant's
forum-state contacts seems attenuated and indirect.'" <u>Harlow</u>,
432 F.3d at 61 (quoting <u>United Elec. Workers</u>, 960 F.2d at 1088–
89).  "Instead, the defendant's in-state conduct must form an
important, or [at least] material, element of proof in the
plaintiff's case." <u>Id</u>. (quotation omitted) (alteration in
original).

1.  <u>Rapid's Contacts with New Hampshire</u>

"In all cases, a court must begin its relatedness inquiry by identifying the alleged contacts, since there can be no requisite nexus between the contacts and the cause of action if no contacts exist." <u>United States v. Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 621 (1st Cir. 2001).  Here, Ad-Tech has offered evidence showing the following (relevant) contacts between Rapid and New Hampshire: (1) e-mails between Rapid and Ad-Tech from 2001 to 2002; (2) a November 2004 meeting at Ad-Tech's offices in Hampton; and (3) e-mails dated September 15 and 16, 2005, from Rapid's engineer, Francis Richardot, to Melendy requesting CAD files containing complete design drawings of all engineered components of the glue guns.

Both parties seem to agree that the identified contacts are pertinent to the jurisdictional inquiry, and constitute forum contacts for purposes of the court's jurisdictional analysis.[4]

_____

[4]  Rapid's only argument to the contrary is that Ad-Tech has not shown that Melendy was in New Hampshire when he received e-mails from Rapid.  Under the <u>prima facie</u> standard, the court finds that the host information on the e-mails ("adhesivetech") is sufficient to establish that Rapid's e-mails were sent to and received in New Hampshire.  <u>Compare</u> <u>Euro-Pro Operating LLC v. Schutte</u>, Case No. 05-11946-DPW, 2006 WL 239802, at *2 (D. Mass. Jan. 31, 2006) (plaintiff failed to establish e-mail contacts with Massachusetts where "most of the [e-mail] recipients are listed without a hostname, and the only identified hostname with a geographical connection suggests a Florida location").

See <u>Int'l Paper Box Mach. Co., Inc. v. Paperboard U.S. Indus.</u>
<u>Inc.</u>, Case No. Civ. 99-184-JD, 2000 WL 1480462, at *3 (D.N.H.
Feb. 8, 2000) ("[C]ommunications to the forum state by telephone
calls, letters, and other means may constitute sufficient
contacts to confer jurisdiction") (citing <u>Burger King</u>, 471 U.S.
462, 476 (1985)); <u>see also</u> <u>GT Solar Inc. v. Goi</u>, Case No. 08-cv-
249-JL, 2009 WL 3417587, at *9 (D.N.H. Oct. 16, 2009) (finding
defendant "reached into the forum through his e-mail and
telephone contacts").  The primary dispute in this case is
whether Rapid's contacts are "meaningful."  That is, whether they
are "sufficiently related to" Ad-Tech's contract and tort claims.
<u>Int'l Paper Box</u>, 2000 WL 1480462, at *3.


     2.  <u>Contract Claims</u>

     The mere presence of a contract relationship between a
defendant and state resident plaintiff is not enough.  <u>Swiss Am.</u>
<u>Bank</u>, 274 F.3d at 621 (mere presence of contract cannot
"automatically establish minimum contacts").  Rather, the court
will look to

          the parties' 'prior negotiations and contemplated
          future consequences, along with the terms of the
          contract and the parties' actual course of dealing.'"
          <u>Daynard</u>, 290 F.3d at 52 (quoting <u>Burger King Corp. v.</u>
          <u>Rudzewicz</u>, 471 U.S. 462, 479 (1985)).  [Plaintiff]
          . . . could show, for example, that "the defendant's
          contacts with the forum were instrumental either in the
          formation of the contract or in its breach."  <u>Phillips</u>

                              13

Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999).

Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1,7 (1st Cir. 2002).

Here, Ad-Tech argues that the 2001-2002 e-mails from Rapid to Ad-Tech concerned the formation of the contract, which was later memorialized in the written Agreement of March 2004.  It further contends that the November 2004 face-to-face meeting in New Hampshire was for the purpose of refining the Agreement's terms, and so, was also directly related to the contract's formation (or modification) as well as performance obligations.

The November face-to-face meeting occurred several months after the parties signed the Agreement.  Ad-Tech says the meeting was for the purpose of putting meat on the bones of the Agreement — clarifying specific details, and working out design and production issues.  Melendy describes the meeting this way:

> In November, 2004, Mikael Schentz and Toby Holm came to visit Ad-Tech in its Hampton, New Hampshire offices. Schentz and Holm and Ad-Tech personnel reviewed the state of Ad-Tech's efforts to engineer glue guns with Isaberg's external design concepts, and further reviewed the wide range of Ad-Tech's glue-gun innovations, which could bring unique features to the new designs then in process.  Schentz and Holm took a number of those innovated products back with them and,

14

in time, a number of the unique features of those
products appeared in Isaberg's new line of glue guns.

Melendy Dec. ¶ 33, Doc. No. 28-2, pg. 10.

Viewed in the light most favorable to Ad-Tech, Melendy's
testimony suggests that Rapid agents came to New Hampshire for
specific purposes related to contract obligations, performance,
and potential modification with respect to acceptable design
criteria.  All in all, while no doubt multi-faceted, the meeting
constituted a forum contact directly related to the contract at
issue, and the claimed breach (acquisition of technical
information contractually required to be kept confidential and
used restrictively, which was later disclosed and
misappropriated).

The 2001-2002 e-mails also appear to be directly related to
the contract's formation, at least on this prima facie showing.
First, Melendy states in his sworn declaration that Rapid and Ad-
Tech engaged in "multiple discussions over a period of several
years," starting with "original project discussions . . . in
2001" for a Rapid product line redesign aimed at creating a
"Euro-look" for the exterior of Rapid's glue guns.  Melendy Dec.
¶¶ 12, 28, Doc. No. 28-2, pgs. 3, 8.  He states that the
discussions culminated in the parties' "formaliz[ing] . . . of

15

the new design project" via the written Agreement of March, 2004.
Melendy Dec. ¶ 29, Doc. No. 28-2, pgs. 9.   In support of
Melendy's averment that discussions leading to the contract's
formation began in 2001, Ad-Tech submitted copies of e-mails
dated from October 4, 2001, to August, 2002, which discuss
Rapid's idea for a product line redesign.   Each e-mail references
all or some of the five Rapid glue guns that the March 2004
written Agreement defines as "product."[5]   <u>See</u> Melendy Dec. Exs.
A, B, I, Doc. Nos. 28-3, 28-4, 28-11.   In particular, the August
22, 2002, e-mail from Rapid's Thierry Leterme to Ad-Tech's Peter
Melendy contains the subject line "CONFIDENTIAL: Design DiY
Guns," and, in the body of the message states that Rapid's board
of directors "approved the idea to work on the new design for the
entire DiY range."   It goes on to state that the "Initial product
range" is to include four glue guns — all of which are later
listed in the written Agreement as "products" to be redesigned.
The e-mail also describes an "Alternative product range" that
includes two guns that are later listed in the Agreement as
"products."   See Melendy Dec. Ex. I, Doc. No. 28-11.

---

[5]  The written Agreement of March, 2004, defines the "products"
for which Ad-Tech will "integrate current or innovative
components" as five Rapid glue guns listed by description and
their former alpha-numeric names (<u>e.g.</u>, "Low Temperature for Oval
Glue Sticks (former EG80/CG90)").   Am. Cmpt. Ex. 1, Doc. No. 20-
1, pg. 4.

In short, when viewed in the light most favorable to Ad-Tech, these e-mail communications contributed meaningfully to, and led directly to, formation of the contract between the parties.  Although the 2001-2002 e-mails preceded the 2004 Agreement by two to three years, which might suggest that the communications were only tenuously related to the 2004 written instrument, the court must disregard that competing inference. See Massachusetts Sch. of Law v. ABA, 142 F.3d 26, 34 (1st Cir. 1998) (under the prima facie standard, the court must "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim").  In any event, the record as developed supports the view that the referenced e-mails were directly related to contract formation.

3.   Tort Claim for Trade Secret Misappropriation

To meet the relatedness requirement, Ad-Tech must establish a causative connection between Rapid's New Hampshire contacts and the trade secret misappropriation claim.  The level of causation required lies "between a 'but for' and a strict proximate cause test," GT Solar Inc. v. Goi, Case No. 08-cv-249-JL, 2009 WL 3417587, at *12, n.29 (D.N.H. Oct. 16, 2009), although the "proximate cause" standard will apply in most cases.  See Harlow, 432 F.3d at 61 ("[I]n most cases 'the proximate cause standard

17

better comports with the relatedness inquiry' . . . . [but] is not a per se requirement of specific jurisdiction.") (citations omitted) (quoting Nowak v. Tak How Invs., 94 F.3d 708, 715 (1st Cir. 1996)).  See also Nowak, 94 F.3d at 716 (finding relatedness in the absence of a "proximate cause relationship," where link between foreign hotel's solicitation of reservations in Massachusetts with subsequent death of guest in hotel pool was "meaningful").  Regardless of the precise degree of legal causation required in any particular case, the touchstone of the inquiry is whether the contacts "form an important, or [at least] material, element of proof in the plaintiff's case." Harlow, 432 F.3d at 61  Id. (quotation omitted) (alteration in original).

Here, Rapid's e-mail contacts with New Hampshire from 2001-2002 are meaningfully linked to Ad-Tech's misappropriation claim because they form an important element of plaintiff's proof. Under New Hampshire's version of the Uniform Trade Secrets Act ("UTSA"), use or disclosure of trade secrets, under circumstances giving rise to a duty of confidentiality, constitutes misappropriation.  N.H. Rev. Stat. Ann. ("RSA") ch. 350-B:1. Here, Rapid's alleged duty of confidentiality is at the heart of Ad-Tech's misappropriation claim.  Rapid's 2001-2002 e-mail contacts with Ad-Tech in New Hampshire "were instrumental in the formation of the confidential business relationship," and the

18

contractual obligation of confidentiality.  <u>Scuderi Group, LLC v.
LGD Tech., LLC</u>, 575 F. Supp. 2d 312, 322 (D. Mass. 2008).

In the August 22, 2002, e-mail, for example, the
confidential nature of the parties' relationship with respect to
the redesign project was made explicit in the subject line, which
reads "CONFIDENTIAL: Design DiY Guns."  Moreover, as already
determined, the e-mails were instrumental in the formation of the
written Agreement, which includes a confidentiality clause.  The
e-mail contacts, therefore, are sufficiently related to Ad-Tech's
misappropriation claim.  <u>See</u> <u>Scuderi Group</u>, 575 F. Supp. 2d at
322 (finding that defendant's contacts with Massachusetts were
related to plaintiff's trade secret misappropriation claim
because they were instrumental in the formation of the parties'
nondisclosure agreement and confidential relationship, by which
"Defendants gained access to Plaintiff's confidential
information").

Rapid's September 15 and 16, 2005, e-mails, in which it
requested Ad-Tech's allegedly confidential information, are also
directly related to the misappropriation claim.  Those requests
were intended to acquire, and succeeded in acquiring, the trade
secrets said to have been misappropriated, allegedly based upon
material misrepresentations.  Proof of those contacts will form

an important element of proof with respect to that claim.  That is true without regard to whether the acquisition was "proper" as having been authorized by the parties' Agreement.  See RSA ch. 350-B:1 II(b) ("'misappropriation' means" use or disclosure of a trade secret by a person whose "knowledge of the trade secret" either was "derived from or through a person who had utilized improper means to acquire it" or "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use").

   Rapid is of the view that this rather clear causal connection between Rapid's September, 2005, requests for the alleged trade secrets on the one hand and Ad-Tech's misappropriation claim, on the other, is jurisdictionally irrelevant.  The CAD files, it argues, contained no Ad-Tech trade secrets which could be misappropriated.  It points out that, to the extent the CAD files contained designs for the external components of the glue guns, those designs belonged to Rapid under the express terms of the contract.  Further, it argues, designs of the internal components were not trade secrets because Ad-Tech's guns were in the public domain and "the redesigned glue guns were to be made with internal components that were generally available, well-known in the industry, not proprietary and used by many competing glue gun manufacturers."  Schentz Dec., Doc. No. 23-2, ¶ 16.

Rapid's point is, essentially, one that addresses disputed material facts and speaks more to the merits than to jurisdiction, but its argument fails for another reason as well — Ad-Tech has made a <u>prima facie</u> showing "based on specific facts set forth in the record," <u>VDI Technologies</u>, 781 F. Supp. at 87, that the CAD files contained Ad-Tech's trade secrets.  First, the written Agreement anticipates that during contract performance <u>both</u> parties would be providing confidential information.  Am. Cmpt. ¶ 9, Doc. 20-1, pg. 2.  Moreover, the evidence submitted by Ad-Tech suggests that during the course of its contract performance Ad-Tech reconfigured the internal components of the guns to embody new Ad-Tech innovations.  In his sworn declaration Melendy avers that "it was never envisioned that these new glue guns would be made with generic parts; rather, it was always contemplated that these new glue guns would have a customized design."  Melendy Dec. ¶ 31.  E-mails attached to Melendy's declaration suggest that the customization to which Melendy refers was not limited to the external design, but also included internal components.  <u>See, e.g.</u>, Doc. 28-10, Ex. H, Rapid's Leterme to Melendy ("In other words, the outcome could then be . . . <u>new</u> design for <u>your</u> glue guns . . . <u>new</u> design for <u>our</u> glue guns") (emphasis added); Ex. Q, Melendy to Rapid's Mennborg ("We have sent the various files for the internal parts of each gun. These parts are the property of Adhesive Technologies and the

ownership therefore is separate and apart from the handleset designs."). Finally, the sworn declaration of Ad-Tech's engineer, Richard Belanger, shows that in providing product design services under the contract, Ad-Tech made changes to the internal components. <u>See</u> Belanger Dec., Doc. No. 28-20 ¶¶ 3-5 ("My primary task was to <u>configure the interior</u> of each of the new glue guns") (emphasis added). Whether and to what extent the engineering/design effort by Ad-Tech constituted trade secrets is disputed, but for these purposes the court must accept the jurisdictional allegations in a light favorable to Ad-Tech.

For these reasons, the court finds that Ad-Tech has made a <u>prima</u> <u>facie</u> showing that its contract and misappropriation claims are sufficiently related to Rapid's meaningful contacts with New Hampshire.

D. *Purposeful Availment*

In determining whether Ad-Tech has satisfied the second prong of the jurisdictional test — showing that Rapid "purposefully availed" itself of the rights and privileges of doing business in New Hampshire — the court must determine whether Rapid "engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable." <u>Sawtelle</u>, 70 F.3d at 1391 (citation omitted).

22

"[R]andom or fortuitous" contacts are not "purposeful."  Burger
King, 471 U.S. at 474-75.  The "two focal points" of the
purposeful availment inquiry are "voluntariness and
foreseeability."  Nowak, 94 F.3d at 716.  The defendant's forum
contacts "must be voluntary — that is, not based on the
unilateral actions of another party or a third person."  Id.
(citing Burger King, 471 U.S. at 475).  Moreover, the defendant's
contacts "must be such that he should reasonably anticipate being
haled into court there."  Id. (citing World-Wide Volkswagen, 444
U.S. 286, 297 (1980)).

### 1.  Voluntariness

A defendant's contacts are not voluntary when it "merely
accepts a relationship tendered from the state."  International
Paper Box Machine Co., Inc. v. Paperboard U.S. Industries, Inc.,
Case No. Civ. 99-184-JD, 2000 WL 1480462, at *5 (D.N.H. 2000).
Instead, defendant "must reach out to the plaintiff's state to
create a relationship."  Id. (citing Phillips Exeter Academy, 196
F.3d at 292).  Here, the evidence, as discussed above, shows
that, through its forum contacts, Rapid reached out to New
Hampshire to create a contractual and confidential relationship
with Ad-Tech, seeking Ad-Tech's expertise and efforts with
respect to its planned product line redesign.  Rapid's contacts
with New Hampshire were, therefore, voluntary.

23

2.  <u>Foreseeability</u>

"[W]here a defendant 'deliberately' has engaged in significant activities within a State . . . or has created 'continuing obligations' between himself and residents of the forum," it is reasonably foreseeable that he may be subject to suit there.  <u>Burger King</u>, 471 U.S. at 474-76; <u>see also</u> <u>Int'l Paper Box</u>, 2000 WL 1480462, at *5.  In assessing foreseeability, the court should look to "whether the defendant benefitted from [its forum] . . . contacts in a way that made jurisdiction foreseeable."  <u>See</u> <u>Phillips Exeter Academy</u>, 196 F.3d at 292; <u>Sawtelle</u>, 70 F.3d at 1394.

In this case, Rapid could have reasonably foreseen that it would be subject to suit in New Hampshire.  Rapid first approached Ad-Tech, through its October 4, 2001, e-mail, to begin discussions of the glue gun redesign.  After that, it continued to pursue that project through additional e-mail contacts, and, particularly, its specific request for Ad-Tech's alleged confidential and trade secret information.  The ultimate commercial benefit for Rapid arising out of its forum contacts consisted of the agreement reached and the confidential technical information obtained.  In short, through its voluntary forum contacts, Rapid created continuing obligations between itself and Ad-Tech, obtained the information allegedly misappropriated, and

24

put itself in a position that (allegedly) facilitated its
improper breach and conversion.  Although some evidence suggests
that Rapid's September 2005 requests for the detailed CAD files
may have been "addressed to delays in the project schedule and
issues about" Ad-Tech's performance, Int'l Paper Box, 2000 WL
1480462, at *5, those contacts, nevertheless, are directly
related to the claimed breach of contract.  Compare, id. (finding
that defendants could not have foreseen being haled into court in
New Hampshire where their contacts related only to plaintiff's
delays and machine performance problems from which no commercial
benefit was derived).

E.  *Reasonableness*

     The final jurisdictional question is whether the exercise of
jurisdiction would be reasonable in light of the five "gestalt"
factors.  See Sawtelle, 70 F.3d at 1394.  Those factors are:
(1) the defendant's burden of appearing; (2) the forum
state's interest in adjudicating the dispute; (3) the plaintiff's
interest in obtaining convenient and effective relief; (4) the
judicial system's interest in obtaining the most effective
resolution of the controversy; and (5) the common interests of
all sovereigns in promoting substantive social policies.  Id.

25

The reasonableness prong "evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." <u>Ticketmaster-New York</u>, 26 F.3d 201, 210 (1st Cir. 1994).  In contrast, on a firm showing of relatedness and purposeful availment, defendant "'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" <u>M&I Eastpoint Techn., Inc. v. Mid-Med Bank</u>, Case No. Civ. 99-411-JD, at *5 (quoting <u>Burger King</u>, 471 U.S. at 477).  Here, Ad-Tech has made a modestly firm showing of relatedness and purposeful availment; Rapid's burden on the reasonableness prong, therefore, is modestly substantial.

The first gestalt factor looks at "the burden on the defendant of appearing in a foreign jurisdiction." <u>GT Solar</u>, 2009 WL 3417587, at *11.  However, "'staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly . . . [so] this factor is only meaningful where a party can demonstrate some kind of special or unusual burden.'" <u>Id</u>. (quoting <u>Pritzker v. Yari</u>, 42 F.3d 53, 64 (1st Cir. 1994)).  To defeat jurisdiction, Rapid must show that the exercise of jurisdiction would be "onerous in a special, unusual, or other constitutionally significant way." <u>Pritzker</u>, 42 F.3d at 64.

26

Here, the first factor does not tip the scales in Rapid's favor. Although Rapid is a Swedish company, it has not demonstrated that defending in this forum poses a unique burden.[6]

The second factor focuses on the interest of the forum state.  Nowak, 94 F.3d at 718.  The forum state's interest is not evaluated by comparing it to the interest of an alternative forum:

> [A]lthough a forum state has a significant interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders, that interest is diminished where the injury occurred outside the forum state.  Nonetheless, our task is not to compare the interest of the two sovereigns — the place of injury and forum state — but to determine whether the forum state has an interest.

Id. (citations omitted) (emphasis in original).

It is well-established that New Hampshire "has a legitimate . . . interest in regulating commercial transactions that are performed within its borders, as well as in enforcing the contracts entered by its businesses . . . ."  Jet Wine, 298 F.3d at 12 (finding second factor weighed in favor of plaintiff).

---

[6]  Although the court "is mindful that the factors applicable to personal jurisdiction and forum non conveniens are distinct and are not to be conflated into a single analysis," M&I Eastpoint, 2000 WL 1466150, at *5, the court's forum non conveniens analysis of party and witness convenience, and access to documentary evidence, see infra, informs the present jurisdictional analysis.

Here, New Hampshire's interest is manifest, because "the source of the parties' [contractual] dispute is a contract to which one of the parties is a New Hampshire corporation that does business in New Hampshire," <u>Id</u>., and Ad-Tech performed its contractual obligations in this state.  New Hampshire likewise has an interest in Ad-Tech's trade secret misappropriation claim.  "New Hampshire certainly has an interest in protecting its citizens from losses that occur as a result of misappropriation of trade secrets, even if the actual misappropriation occurred elsewhere." <u>GT Solar</u>, 2009 WL 3417587, at *11.  And although New Hampshire's "interest may be diminished by the fact that the actual misappropriation occurred" in Europe, its interest "is nonetheless important" because "the forum contacts are alleged to be vital to the extraction of those secrets." <u>Id</u>.  The second factor weighs in favor of Ad-Tech.

With respect to the third factor, "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." <u>Sawtelle</u>, 70 F.3d at 1395.  Here, it obviously would be more convenient for Ad-Tech to litigate its claims here rather than elsewhere.  Furthermore, Ad-Tech "did not choose a random forum, but rather its home district, where it has a heightened interest." <u>GT Solar</u>, 2009 WL 3417587, at *12

(citing <u>Sawtelle</u>, 70 F.3d at 1395).  This factor, therefore, favors Ad-Tech.

The fourth factor requires the court to evaluate "the judicial system's interest in obtaining the most effective resolution of the controversy."  <u>Nowak</u>, 94 F.3d at 718.  This factor is usually "a wash."  <u>Id</u>.  Here, as discussed more fully below in the <u>forum</u> <u>non</u> <u>conveniens</u> analysis, potential witnesses and key documents are located both in New Hampshire and in Europe.  Each forum, moreover, "will present challenges involving limits on [each] court's subpoena power and the availability of witnesses."  <u>GT Solar</u>, 2009 WL 3417587, at *11.  This factor, therefore, favors neither party.

Finally, the fifth factor "addresses the interests of the affected governments in substantive social policies."  <u>Nowak</u>, 94 F.3d at 719.  "[T]he most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors."  <u>Sawtelle</u>, 70 F.3d at 1395.  In this case, the fifth factor favors neither party.  <u>See</u> <u>GT Solar</u>, 2009 WL 3417587, at *12.  New Hampshire has a strong interest in providing its citizens a forum to redress injuries.  <u>See</u> <u>Scuderi Group</u>, 575 F. Supp. 2d at 324.  The Swedish judicial district in which Rapid is located,

29

likewise, has a strong interest in providing a fair forum for its citizens faced with breach of contract and trade secret misappropriation claims made by foreign citizens.  <u>See</u> <u>Nowak</u>, 94 F.3d at 719.

The court finds that the gestalt factors weigh either neutrally or in favor of Ad-Tech.  The exercise of personal jurisdiction in New Hampshire, therefore, is reasonable.  Based on Ad-Tech's additional showings of relatedness and purposeful availment, the court concludes that Rapid is subject to personal jurisdiction in New Hampshire.[7]

### <u>Forum</u> <u>Non</u> <u>Conveniens</u>

Rapid also seeks dismissal under the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u>, arguing that Sweden is the most appropriate forum to adjudicate this dispute.  "When a defendant moves for dismissal on <u>forum</u> <u>non</u> <u>conveniens</u> grounds, it bears the burden of showing both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly

---

[7]  Alternatively, under the theory of pendant personal jurisdiction, the court has personal jurisdiction over Rapid on all of Ad-Tech's claims (except the fraud claim, which is dismissed) by virtue of having personal jurisdiction over at least one of Ad-Tech's claims (the misappropriation claim).  <u>See,</u> <u>e.g.</u>, <u>D'Jamoos v. Atlas Aircraft Ctr., Inc.</u>, 669 F. Supp. 2d 167, 174-75 (D.N.H. 2009) (McAuliffe, J.).

favor litigating the claim in the alternative forum." <u>Interface
Partners Int'l, Ltd. v. Hananel</u>, 575 F.3d 97, 101 (1st Cir.
2009).

A defendant can satisfy the first condition if it
"demonstrates that the alternative forum addresses the types of
claims that the plaintiff has brought and that the defendant is
amenable to service of process there." <u>Id</u>. (quotations omitted).
The second condition requires the defendant to show that, on
balance, "the compendium of factors relevant to the private and
public interests implicated by the case strongly favors
dismissal." <u>Id</u>. (quotations omitted).  Private factors include:
"the relative ease of access to sources of proof; availability of
compulsory process for attendance of unwilling, and the cost of
obtaining attendance of willing, witnesses; and the possibility
of view of premises, if [a] view would be appropriate to the
action," <u>Iragorri v. International Elevator, Inc.</u>, 203 F.3d 8, 12
(1st Cir. 2000) (quotations and brackets omitted) (quoting <u>Gulf
Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508 (1947)), as well as "all
other practical problems that make trial of a case easy,
expeditious and inexpensive and questions as to the
enforceability of a judgment if one is obtained." <u>Mercier v.
Sheraton Int'l, Inc.</u>, 935 F.2d 419, 424 (1st Cir. 1991)
(quotations and brackets omitted).

31

Public interest factors "include such things as the
administrative difficulties of docket congestion; the general
goal of 'having localized controversies decided at home,' and
concomitantly, ease of access to the proceedings on the part of
interested citizens; the trier's relative familiarity with the
appropriate rules of decision; and the burdens of jury duty."
Iragorri, 203 F.3d at 12 (quoting Gulf Oil Corp., 330 U.S. at
508-09).[8]

The Court of Appeals has emphasized that the plaintiff's
forum choice should not be given dispositive weight.
Nevertheless, that choice "will be disturbed only rarely" and the
doctrine of forum non conveniens should be used only "to avoid
serious unfairness."  Nowak, 94 F.3d at 719.

A.  Adequate Alternative Forum

Rapid has supportably argued that the Swedish courts would
provide an adequate alternative forum, and of course that is no

---

[8]  In balancing the private and public factors, the court will
focus on those most pertinent to the case before it.  See
Iragorri, 203 F.3d at 12 ("[N]ot every item applies in every case
and, in the last analysis, the list of factors is illustrative
rather than all-inclusive.  The ultimate inquiry is where trial
will best serve the convenience of the parties and the ends of
justice") (quotations and brackets omitted) (quoting Koster v.
(American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 527
(1947)).

doubt true.  Ad-Tech does not dispute the evidence submitted, and complains only that Sweden will not allow a jury trial.  The absence of a jury trial, however, is insufficient to render the alternative forum inadequate.  See Lockman Foundation v. Evangelical Alliance Mission, 930 F.2d 764, 768 (9th Cir. 1991) (finding foreign forum adequate despite lack of jury trial); Magnin v. Teledyne Continental Motors, 91 F.3d 1424, 1430 (11th Cir. 1996) (same).  In light of Rapid's undisputed evidence, the court finds that Swedish courts would serve as an adequate alternative forum.

B.  *Convenience and Judicial Efficiency*

     Rapid has failed to demonstrate that the private and public factors strongly counsel in favor of dismissal.  With regard to witness convenience and compulsory process, the scales are not tipped heavily in favor of a Swedish forum.  Undoubtedly, witnesses living in Belgium and France would find it easier to travel to Sweden than to the United States.  However, the reverse is likely true of Ad-Tech's witnesses located here.  See Nowak, 94 F.3d 708, 720 (1st Cir. 1996) (finding cost and inconvenience to defendant of transporting witnesses to Massachusetts was not "disproportionate to" the burden plaintiff and its witnesses would experience if the case were tried in Hong Kong).  While the European witnesses are not subject to compulsory process in New

Hampshire, Rapid has not shown that potential French and Belgium witnesses (some of whom are no longer employed by Rapid) are subject to compulsory process in Sweden.  With regard to potential Chinese and Taiwanese witnesses, both forums are equally lacking in power to compel their appearance and travel to Sweden or the United States would be equally burdensome.  Thus, on balance, while the greater number of European witnesses, as compared to American witnesses, tips the scales moderately in Sweden's favor, there has been no showing that witness considerations "strongly" favor litigating this case in Sweden.

In addition, Rapid has not shown that access to documentary proof is significantly easier in Sweden than in New Hampshire. Counsel for Rapid conceded at oral argument that European privacy laws will likely place complicated roadblocks in the way of both parties' access to some types of documents, regardless of where the case is litigated.  Moreover, although some documents will likely need translating for use in this court, as compared to the Swedish court, that fact, when considered with all other private factors in this case, does not tip the scale strongly in favor of the Swedish forum.

Finally, the public interest weighs in favor of neither venue because it would be "difficult to describe [this] dispute

as localized" in one venue and not the other. <u>ECCO Retail, Inc.</u>
<u>v. Comfort Group, Inc.</u>, Case No. 10-cv-211-LM, 2010 WL 4365861,
at *4 (D.N.H. Nov. 3, 2010). Ad-Tech is a New Hampshire
corporation that performed its contractual obligations in New
Hampshire, while Rapid performed its contractual obligations in
Sweden and France.


Accordingly, in the exercise of its discretion, the court
will not disturb Ad-Tech's choice of forum.


### Failure to State Claims Under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss for "failure to state a claim upon which
relief can be granted," Fed. R. Civ. P. 12(b)(6), requires the
court to conduct a limited inquiry, focusing not on "whether a
plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims." <u>Scheuer v.</u>
<u>Rhodes</u>, 416 U.S. 232, 236 (1974). Although the complaint need
only contain "a short and plain statement of the claim showing
that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2),
it must "contain sufficient factual matter, accepted as true, to
state a claim to relief that is plausible on its face." <u>Ashcroft</u>
<u>v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citation and internal
punctuation omitted).

In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  Instead, the facts alleged in the complaint must, if credited as true, be sufficient to "nudge[] [plaintiff's] claims across the line from conceivable to plausible." <u>Id</u>. at 570.  If, however, the "factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." <u>SEC v. Tambone</u>, 597 F.3d 436, 442 (1st Cir. 2010).

In resolving a motion to dismiss under Rule 12(b)(6), the court "should employ a two-pronged approach." <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 2011 WL 1228768, at *9 (1st Cir. April 1, 2011) (quoting <u>Iqbal</u>, 129 S. Ct. at 1949).  First it should identify and disregard conclusory allegations. <u>Id</u>.  "Non-conclusory factual allegations . . . must then be treated as true" and assessed to determine whether they "'allow[…] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Id</u>. (quoting <u>Iqbal</u>, 129 S. Ct. at 1949).  If they do, the "claim has facial plausibility." <u>Id</u>.  <u>See also</u> <u>Tambone</u>, 597 F.3d at 441 (the court must "accept as true

all well-pleaded facts set out in the complaint and indulge all
reasonable inferences in favor of the pleader.").  In making the
plausibility determination, the court must evaluate "<u>all</u> the
facts alleged" and their "cumulative effect."  <u>Ocasio-Hernandez</u>,
2011 WL 1228768, at *9.

     Rapid challenges the facial plausibility of the complaint,
contending that the allegations do not state claims under any
theory advanced under the four counts of the complaint.

A.  *Trade Secret Misappropriation*

     The New Hampshire UTSA provides for injunctive and monetary
relief for trade secret "misappropriation."  RSA ch. 350-B:2.
Under UTSA, "misappropriation" means, among other things,

> (b)  Disclosure or use of a trade secret of another
> without express or implied consent by a person who:
>
> > (1)  Used improper means to acquire knowledge
> > of the trade secret; <u>or</u>
> >
> > (2)  At the time of disclosure or use, knew
> > or had reason to know that his knowledge of
> > the trade secret was derived from or through
> > a person who had utilized improper means to
> > acquire it; or <u>acquired under circumstances
> > giving rise to a duty to maintain its secrecy
> > or limit its use</u>; or derived from or through
> > a person who owed a duty to the person
> > seeking relief to maintain its secrecy or
> > limit its use; or

RSA 350-B:1 II(b) (emphasis added).


Rapid argues that Ad-Tech's complaint fails to plausibly
allege all of the elements of an UTSA claim, particularly the
existence of trade secrets.  Accepting as true "all the facts
alleged" and their "cumulative effect," Ocasio-Hernandez, 2011 WL
1228768, at *11 (emphasis in original), the court finds
otherwise.


First, Ad-Tech has plausibly alleged the existence of trade
secrets.  The complaint generally alleges that "information
developed under the Agreement included valuable trade secrets of
Ad-Tech."  Am. Cmpt. ¶37, Doc. No. 20, pg. 9.  Standing alone,
this allegation is insufficient.  However, several other, more
specific allegations give rise to a reasonable and plausible
inference that the confidential engineering information in the
CAD files contained Ad-Tech's technical trade secrets.  Factual
allegations describing the expertise and services Ad-Tech
provided Rapid under the contract, for example, plausibly suggest
that Ad-Tech used or developed its own trade secrets in
performing its contractual design obligations.  See Am. Cmpt. ¶¶
8, 9, 11, 15, Doc. No. 20, pgs. 3-6.  The written Agreement
itself, which is incorporated into the complaint, contemplated
that "Ad-Tech [would] integrate current or innovative components

38

to fit the Rapid's suggested design."  Am Cmpt., Ex. 1, ¶ 2, Doc.
No. 20-1, pg. 1) (emphasis added).[9]  Consistent with the
Agreement, the CAD files are alleged to include "engineering
drawings, relating to the components Ad-Tech <u>designed</u>
<u>specifically</u> for the new glue guns and also relating to
components <u>used in existing Ad-Tech glue guns</u> that were used in
the new glue guns."  Am. Cmpt. ¶ 19, Doc. No. 20, pg. 6.  Ad-
Tech's complaint, moreover, sets forth specific factual
allegations describing what actions it took to protect its
proprietary information contained in the CAD files.  Am. Cmpt. ¶¶
9, 21, Doc. No. 20, pgs. 4, 7.  Those actions suggest that the
information was not generally known to the public.  <u>See</u>
<u>MedioStream, Inc. v. Microsoft Corp.</u>, 2010 WL 4274578, 6 (E.D.
Tex., 2010) (holding that factual allegation regarding the
protective steps taken by the plaintiff rendered plausible
plaintiff's allegation that the information was not generally
known to the public).

     Ad-Tech may be required at a later stage in this litigation,
such as during the discovery process, to more specifically

---

[9]  In the Rule 12(b)(6) analysis the court looks only to the
allegations pled, and does not take into consideration (as was
done in the jurisdictional analysis) evidence proffered by Ad-
Tech in support of its allegation that the CAD files contained
trade secrets.

identify the alleged trade secrets.  See, e.g., Imax Corp. v.
Cinema Techs., 152 F.3d 1161, 1167-68 (9th Cir. 1998) (affirming
district court's discovery sanction against plaintiff for its
failure to adequately identify trade secret during discovery).
See also Ansys, Inc. v. Computational Dynamics North, Case No.
09-cv-284-SM, 2009 WL 4403745 at *5 (D.N.H. Nov. 25, 2009)
(requiring, on motion for preliminary injunction, specificity in
identification of trade secrets).  However, for pleading purposes
Ad-Tech has plausibly alleged the existence of trade secrets and,
thereby, has given Rapid adequate notice of the claim against it.
See Lincoln Park Sav. Bank v. Binetti, Case No. 10 CV 5083, 2011
WL 249461, at *2 (N.D. Ill. Jan. 26, 2011) (where complaint "was
not a model of specificity," nevertheless finding under Iqbal
that it plausibly alleged trade secrets, noting that "[w]hile it
is not enough to point to broad areas of technology . . . trade
secrets need not be disclosed in detail in a complaint . . . for
the simple reason that such a requirement would result in public
disclosure of the purported trade secrets") (quotations and
citations omitted).  See also Brocade Comm. Sys., Inc. v. A10
Networks, Inc., Case No. 10-cv-032428-LHK, 2011 WL 1044899, at *5
(N.D. Cal. Mar. 23, 2011) (finding complaint plausibly alleged
trade secrets under Iqbal's standards where it broadly alleged
defendant's misappropriation of plaintiff's "design of its
ServerIron and ADX products, related software including source

code, customer information, and employee information"); <u>W.L. Gore & Assocs. v. GI Dynamics, Inc.,</u> Case No. CV-10-8088-PHX-GMS, 2010 WL 5184254, at *25-27 (D. Ariz. Dec. 15, 2010) (finding trade secret misappropriation claim adequately pled in light of <u>Iqbal</u> where plaintiff alleged misappropriation of plaintiff's "research, development, and market opportunities" and "product design . . . patent portfolio, and future plans").

Finally, Ad-Tech unambiguously describes the circumstances under which Rapid is alleged to have "disclose[d] or use[d]" the trade secret, that is, for the manufacture of identical glue guns in China.  <u>See</u> Am. Cmpt. ¶ 37, Doc. 20, pg. 9 ("Rapid disclosed, without express or implied consent by Ad-Tech, Ad-Tech's information to competing manufacturers (<u>e.g.</u>, in China).").  The complaint also sets forth factual allegations showing that Rapid "knew or had reason to know that [its] knowledge of the trade secret was . . . acquire[d] under circumstances giving rise to a duty to maintain its secrecy or limit its use."  RSA 350-B:1 II(b).  The circumstances giving rise to Rapid's duty to maintain secrecy are the confidential relationship between the parties and the Agreement itself, both of which are specifically described in the complaint.

Thus, Ad-Tech has pled sufficient facts to show that its trade secret misappropriation claim under UTSA is plausible. Rapid's motion to dismiss Ad-Tech's misappropriation claim for failure to state a claim is denied.

B.   Breach of Contract and Breach of Duty of Good Faith and Fair
     *Dealing*

     1.   <u>Breach of Contract</u>

The complaint alleges that Rapid breached the contract by (1) failing to buy the finished products from Ad-Tech; (2) circumventing Ad-Tech as a supplier; (3) not paying Ad-Tech for the engineering services it performed; and (4) using "false pretexts to obtain [the] confidential information" contained in the CAD files.  Am. Cmplt. ¶25, Doc. No. 20, pg. 8.

Rapid challenges the facial plausibility of all four alleged breaches.  As to the first three, Rapid argues that the written Agreement placed only one duty on Rapid: to buy "some" product from Ad-Tech, which the complaint alleges Rapid did.  Considering "<u>all</u> the facts alleged" and their "cumulative effect," <u>Ocasio-Hernandez</u>, 2011 WL 1228768, at *11 (emphasis in original), the court finds that the complaint plausibly alleges that the contract required Rapid to buy glue guns from Ad-Tech as its exclusive supplier, and that Rapid's purchase of glue guns from a

42

different manufacturer — and that the consequent failure to meet
its purchase "requirements" from Ad-tech and failure to
compensate Ad-Tech for its efforts — constituted breaches of the
contract.  (Whether the contract is susceptible to a different
construction (e.g., whether "some" is ambiguous) is an issue more
appropriately resolved following discovery and adequate
briefing.)

     The complaint expressly alleges that the written Agreement
was not the entire contract between the parties, but rather,
"provided a framework for further discussions of final terms, and
to 'start a project' between Ad-Tech and Isaberg Rapid."  Am.
Cmpt. ¶ 9, Doc. No. 20, pg. 4.  Second, additional allegations
plausibly suggest, directly and by reasonable implication, that
the final, and actual, terms of the contract required Rapid to
compensate Ad-Tech's engineering and manufacturing efforts
through substantial, and exclusive, product orders from Rapid.
See Am. Cmpt. ¶¶ 9, 15-21 (alleging Ad-Tech was to be the
"exclusive supplier" to Rapid; describing Ad-Tech's extensive
investment of time and effort; alleging Ad-Tech shared
confidential information with Rapid "to facilitate mutual
cooperation in the manufacturing of the new line of hot melt glue
guns").  Accordingly, the complaint, read in a light favorable to
plaintiff, plausibly alleges breaches by Rapid in failing to buy

43

finished products from Ad-Tech, circumventing Ad-Tech as a
supplier, and failing to pay Ad-Tech for engineering services it
performed.

The complaint, read liberally, also plausibly alleges that
Rapid's acquisition of Ad-Tech's confidential information under
false pretenses constituted a breach of the contract.  The
written Agreement expressly provides that the parties "shall have
an open and constructive technical co-operation regarding this
project."  In support of that arrangement, the Agreement further
provides that confidential information exchanged by the parties
was to be kept confidential.  While the Agreement envisions
mutual access to some confidential information, the agreement
does not contemplate one party's acquisition of the other's
confidential information unnecessary to contract performance, nor
does it contemplate acquisition of confidential information on
the basis of a material misrepresentation (as alleged), nor does
it contemplate either disclosure of the other party's
confidential information or self-dealing.

At this early stage, the court finds that the complaint,
read liberally, states a claim for breach of contract.

2. <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

The complaint alleges that Rapid breached its implied duty of good faith and fair dealing by (1) failing to cooperate in good faith on "discretionary matters" relating to final design of the glue guns, and (2) acquiring Ad-Tech's confidential information under "false pretexts."  Rapid argues that these allegations do not state a claim for breach of the implied duty of good faith because no discretion, nor abuse of discretion, is alleged.

Under New Hampshire law, there is "an implied covenant of good faith performance where a contract 'by word or silence . . . invest[s] one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value.'"  <u>Ahrendt v. Granite Bank</u>, 144 N.H. 308, 312-13 (1999) (quoting <u>Centronics Corp. v. Genicom Corp.</u>, 132 N.H. 133, 143 (1989)).  In determining whether a party breached such a covenant, the court must answer "four questions": (1) Did the agreement "allow . . . or confer upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value?"; (2) Did the parties "intend to make a legally enforceable contract?"; (3) Has "the defendant's exercise of discretion exceeded the limits of reasonableness?"; and (4)

Did "the defendant's abuse of discretion cause the damage or [did] the damage 'result from events beyond the control of either party, against which the defendant has no obligation to protect the plaintiff?'"  Id. (quotations and citations omitted).  Here, the parties dispute whether the complaint plausibly alleges discretion in performance and abuse of that discretion.

A general allegation that the defendant had "discretion in contract performance" must be supported by allegations of specific fact.  See Lowry v. Cabletron Sys., 973 F. Supp. 77, 84 (D.N.H. 1997) (dismissing claim for breach of implied duty of good faith in performance where plaintiff "fail[ed] to allege facts to support the conclusion that defendant had such discretion").  Where discretion is alleged, its abuse is measured by "the purpose of the agreement against which the reasonableness of the complaining party's expectations may be measured."  Ahrendt, 144 N.H. at 313 (quotation omitted).

Here, with respect to the allegation that the contract gave Rapid discretion in matters relating to the final design of the glue guns, the court finds the specific facts alleged in the complaint sufficient to move the allegation across the line from conceivable to plausible.  The complaint identifies, by way of example, final design matters over which Rapid had discretion.

46

<u>See</u> Am. Cmpt. ¶ 26, Doc. 20, pg. 8 ("final design of components, such as triggers," and "specifications for additional features"). The written Agreement supports the existence of such discretion. <u>See</u> Am. Cmpt., Ex. A, ¶ 2, Doc. No. 20-1, pg. 4 ("Ad-Tech final product specifications must be in accordance with Rapid's product specification xxxx enclosure 2").

The complaint also plausibly alleges that Rapid abused its discretion.  The purpose of the contract — against which the reasonableness of Rapid's conduct is to be measured — was the redesign and manufacture of glue guns, for which Ad-Tech would receive compensation through exclusive sales of the manufactured products to Rapid.  Rapid's alleged failure to cooperate in matters of final design is alleged to be an abuse of discretion because it frustrated the very purpose of the contract.  Indeed, the complaint alleges that outcome specifically: "Rapid's failure to cooperate in good faith . . . adversely affected the ability of Ad-Tech to provide products under the Agreement at competitive prices."  Am. Cmpt. ¶¶ 28-29, Doc. No. 20, pgs. 8-9.  The complaint, therefore, plausibly alleges that Rapid had discretion in matters relating to performance and that it abused that discretion by failing to cooperate in good faith with respect to final design approval, to deprive Ad-Tech of substantial consideration.

47

Ad-Tech's allegation regarding Rapid's use of false pretenses to acquire Ad-Tech's confidential information, however, does not fare as well.  The complaint contains no allegations to link the false pretenses to some discretion conferred on Rapid by the contract.  Ad-Tech's only rebuttal to this deficiency is to ask the court to deem incorporated into the complaint the facts averred in the Melendy declaration.  The court declines to do so.

The complaint plausibly states a claim for breach by Rapid of the covenant of good faith and fair dealing with respect to matters involving the final design of the glue guns, but fails to allege such breach with respect to Rapid's acquisition and alleged misuse of the confidential information.

### Failure To Plead Fraud With Particularity Under Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 9(b) requires that a party alleging fraud "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Id.  The Court of Appeals has interpreted Rule 9(b) to require that the complaint "allege at minimum the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by

which the misrepresentation was communicated."  <u>Clearview</u>
<u>Software Int'l Inc. v. Ware</u>, Case No. 07-cv-405-JL, 2009 WL
2151017, at *1, n.3 (D.N.H. July 15, 2000).

Here, the amended complaint alleges that "[t]he Isaberg
Rapid engineer responsible for this program" requested
confidential information from an Ad-Tech employee "via telephone"
on "September 15, 2005."  Am. Cmpt. ¶ 20, Doc. No. 20, pg. 6.  It
is alleged that the reason offered by the engineer for Rapid's
request was false.  <u>Id</u>.  The complaint additionally alleges that
"key management employees" made false representations as to why
Rapid needed the confidential information, and that "[t]he real
reason [for the request] . . . was to enable Rapid to eliminate
Ad-Tech from the supply and distribution chain for the new line
of hot melt glue guns."  Am. Cmpt. ¶ 43, Doc. No. 20, pgs. 10-11.
Rapid made the misrepresentations, it is alleged, "intentionally
in order to induce Ad-Tech into providing its confidential
information."  Am. Cmpt. ¶ 44, Doc. No. 20, pg. 11.

The fraud claim is sufficient under Rule 9(b) in some
respects, and suspect in others.  The complaint clearly alleges
the content and context of the misrepresentations, and, with
respect to Rapid's engineer, it alleges the date and mode of the
communication.  The complaint does not identify by name or

position the "key management employees" who also allegedly made misrepresentations, nor the dates and modes of communication. Taking the complaint as a whole, however, it is apparent that plaintiff is alleging that defendant misrepresented a material fact — its need for technical data to satisfy European regulatory requirements — when in reality it was seeking the information for the improper purpose of converting it to its own use, in violation of its contractual and confidentiality obligations.

Rapid's motion to dismiss Count IV of the Amended Complaint for failure to plead fraud with the requisite particularity, as required by Rule 9(b), is denied.

### Conclusion

Rapid's motion to dismiss (document no. 23) is granted in part and denied in part.  The court denies the motion to the extent it seeks dismissal for lack of personal jurisdiction, and on grounds of <u>forum</u> <u>non</u> <u>conveniens</u>.  The motion is granted in part and denied in part on Fed. R. Civ. P. 12(b)(6) grounds, as set out above.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

May 26, 2011

cc:  Daniel G. Smith, Esq.
     Conrad J. Clark, Esq.
     Todd R. Dickinson, Esq.
     Alexandra M. Gorman, Esq.
     Matthew J. Matule, Esq.